The Honorable Benjamin H. Settle

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| UNITED STATES OF AMERICA, | NO. CR18-5141BHS |
| Plaintiff, | |
| v. | GOVERNMENT'S RESPONSE TO DEFENDANT'S MOTION TO SUPPRESS (Dkt 32) |
| DONNIE BARNES, SR., | |
| Defendant. | |

## I.    INTRODUCTION

Defendant Donnie Barnes, Sr., molested a young girl and shared photos of his abuse online.  In March 2018, ICE-HSI[1] Special Agent Reese Berg obtained and executed search warrants for his home and person.  During that search, Barnes confessed to his crimes against MV1, as well as possessing other child pornography.  Here, he challenges neither the factual basis for the search nor the circumstances under which he was interviewed.  Instead, grasping at straws, he offers two grounds he claims warrant suppression of both the search and his confession.  Both lack merit, and even if they did not, suppression is neither available as a remedy nor warranted under the circumstances.

---

[1] HSI is a component of U.S. Immigration and Customs Enforcement, under the Department of Homeland Security.

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 1

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

First, Barnes says ICE-HSI obtained IP subscriber information from Comcast in violation of the Fourth Amendment.  But that subscriber information belonged to K.T., not Barnes, meaning he has no standing to assert this claim.  And the Fourth Amendment does not protect information voluntarily provided to third parties, so there is no claim to present.  Finally, Barnes errs when he claims that 19 U.S.C. § 1509 prohibits ICE-HSI from using summonses in child exploitation cases. But even if he were right, suppression would be improper and unwarranted where no constitutional violation occurred.

Second, Barnes grouses about the timing of the search and seeks suppression. Here, SA Berg provided ample justification to begin the searches before 6:00 a.m., and the reviewing magistrate judge expressly authorized his doing so.  That is all Rule 41 requires, and there is no basis for suppression.  Moreover, Barnes offers no explanation why a search that occurred less than one hour before the time at which Rule 41 requires no special permission was unreasonable under the circumstances.  Nor could he.  Law enforcement acted in good faith, complying fully with Rule 41.  And Barnes suffered no prejudice, nor was the search or its execution constitutionally deficient, rendering suppression unavailable.

In sum, Barnes offers no valid basis for suppression, and his motion should be denied without a hearing.

## II.    FACTUAL AND PROCEDURAL BACKGROUND

The relevant facts are largely undisputed.  In February 2018, ICE-HSI Special Agent Reese Berg opened an investigation into an individual (later identified as Defendant Donnie Barnes, Sr.) who was sexually abusing a young girl and posting images of that abuse on the Internet.  SA Berg began this investigation after he received a lead from Australian law enforcement.  An Australian undercover officer had communicated with Barnes after Barnes posted sexually explicit images of a young girl on a public photo-sharing website.

Among the photos Barnes shared was a close-up photo of the genitals of a prepubescent female, MV1.  MV1 was lying face down, and her underwear had been

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 2

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1   pulled aside, exposing her buttocks and genitals.  This photo was one in a series that all
2   depicted the same young girl that Barnes posted to the site.  After Barnes posted the
3   images, the undercover initiated email correspondence with Barnes.  In this
4   correspondence, among other things, Barnes identified the victim in the photos as an
5   eleven-year-old female.  He told the undercover MV1 was his "sweet little toy" and
6   described this child as "sexy," "flirty," and "fun to play with."  The undercover told
7   Barnes that he had an eleven-year-old stepdaughter that he was just starting to groom and
8   abuse.  Barnes asked the undercover if he had any pictures of his victim to share.

9       The undercover officer obtained a list of IP logins for Barnes's photo sharing
10  website account, which showed numerous logins from various IP addresses between
11  August 2017 and February 2018.  Among the IP addresses used by Barnes to access this
12  site in February 2018 was an IP address belonging to Comcast Communications.  In
13  response to a summons issued under 19 U.S.C. § 1509(a)(1), Comcast reported that
14  during the time Barnes used IP address 73.140.63.12 to access the photo-sharing site, it
15  was assigned to K.T. at her home in Spanaway, Washington, which she shared with
16  Barnes and two minors.  Ex. 1 at 205.

17      On March 2, 2018, SA Berg applied for and obtained warrants to search Barnes's
18  home and person for evidence of various child sexual exploitation offenses from
19  Magistrate Judge Theresa L. Fricke.  Based on law enforcement observations of Barnes's
20  workday schedule, SA Berg also sought (and received) permission to execute the search
21  during the nighttime hours, that is, between 10:00 p.m. and 6:00 a.m.  Ex. 2 at 00033,
22  00040.  Though, as noted in the affidavit, SA Berg planned to execute these warrants
23  between 4:00 and 6:00 a.m., thereby maximizing the chances of encountering Barnes at
24  home.  As Barnes notes, law enforcement executed those warrants shortly after 5:00 a.m.
25  on May 6, 2018, less than one hour before the 6:00 a.m. cutoff when Rule 41 requires no
26  special authorization.

27      To minimize disruption to Barnes and the other occupants of the home and
28  maximize the safety of all concerned, agents started surveillance in the early morning

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 3

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  hours of March 6, 2018.  Agents did not approach the home to begin execution until
2  surveilling agents reported seeing a light on within the home, suggesting that someone
3  (likely Barnes) was awake.  When agents knocked and announced their presence, Barnes
4  answered the door.  He was fully dressed and appeared ready to depart the house
5  imminently.[2]

6        SA Berg encountered Barnes in the home, and Barnes agreed to be interviewed.
7  In a post-*Miranda*, recorded interview, Barnes acknowledged, among other things:

8      • He was the user of the photo-sharing website who communicated with the
9         Australian undercover officer and posted the images of MV1;

10     • He took the photo of MV1's genitals while she slept and had taken a number of
11        other sexually explicit photos or videos of MV1 over the preceding months,
12        which would be found on his Apple iPhone;

13     • He obtained a thumb drive containing several videos of child pornography
14        from an unidentified individual after providing that individual some of MV1's
15        underwear.

16       During the search, agents located Barnes's iPhone and the thumb drive he
17 described.  A forensic examination of those and other digital devices revealed Barnes
18 had, in fact, taken other sexually explicit images and videos of MV1 and possessed a
19 thumb drive containing several videos of other minors being sexually abused.

20       Barnes was taken into custody and charged by criminal complaint on the day of
21 the search.  The Grand Jury subsequently returned an Indictment charging Barnes with
22 one count each of producing, distributing, and possessing child pornography.  Trial is
23 scheduled to begin June 25, 2019.

24

25

26

27 _____

28 [2] Much of the information surrounding the execution of the searches is detailed in the agent reports produced in discovery and does not appear to be in dispute.  To the extent certain factual details are not, however, the government is proceeding by way of an offer of proof.

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 4

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

### III.   ARGUMENT

To place Barnes's motion to suppress in context, it is important to note what he is not challenging.  He is not, for example, challenging the showing of probable cause and does not suggest the reviewing magistrate judge abandoned her judicial role.  Nor does he claim the affidavit contained material falsehoods.  And he does not suggest that the search warrants were overbroad, lacked particularity, or otherwise suffer from constitutional defect.  Rather, he identifies two alleged problems with the conduct of the investigation.  Both are meritless, and neither are of constitutional import.  Even if they had merit, they would not justify the extraordinary remedy of suppression.

First, Barnes wrongly asserts that the summons used to obtain subscriber information from Comcast was unlawful and violated his Fourth Amendment rights. Suppression is unavailable, however, because Barnes suffered no constitutional violation. Nor did anyone else for that matter.  The subscriber information at issue was not his, depriving him of standing to assert any Fourth Amendment claim, and such information is not protected by the Fourth Amendment in any event, meaning there is no claim to press.  As such, even if Barnes could show that the summons to Comcast violated Section 1509 (he cannot), suppression is unavailable for statutory violations that do not implicate constitutional rights.

Second, Barnes claims that the search of his home and person was unreasonable because it occurred at nighttime—that is, between 10:00 p.m. and 6:00 a.m.  This "nighttime" search, occurring less than one hour before 6:00 a.m., was, however, expressly authorized by the reviewing magistrate judge upon a showing of good cause. That is all that is required by Rule 41.  And even if the showing were deemed insufficient, suppression is unavailable to remedy mere technical violations of Rule 41 that are neither of constitutional magnitude nor result in prejudice to the defendant.

//

//

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 5

UNITED STATES ATTORNEY
700 Stewart Street, Suite 5220
Seattle, Washington  98101
(206) 553-7970

**A.   Barnes cannot establish a constitutional violation that would warrant suppression based on the seizure of another's subscriber information.**

Barnes's claim that the warrantless seizure of subscriber information violates the Fourth Amendment utterly fails, and suppression is unwarranted for at least three reasons. First, Barnes lacks standing to assert such a claim because the subscriber information at issue is not his own but another's.  Second, the subscriber information provided by Comcast is not entitled to Fourth Amendment protection because customers cannot claim a legitimate expectation of privacy over information voluntarily given to third parties. Finally, even assuming *arguendo* Barnes suffered a constitutional deprivation, good faith precludes suppression in this case.

**1.   Barnes lacks standing to assert a Fourth Amendment claim that, if it exists at all, belongs to another person.**

Barnes lacks standing to assert a Fourth Amendment claim over subscriber information that does not belong to him and was provided to Comcast by another person, K.T.  It is a bedrock principle of constitutional law that "Fourth Amendment rights are *personal* rights [that] . . . may not be vicariously asserted." *Brown v. United States*, 411 U.S. 223, 228 (1973) (emphasis added).  The onus is on Barnes to "demonstrate that *he personally* has an expectation of privacy in the place searched, and that *his* expectation is reasonable." *Minnesota v. Carter*, 525 U.S. 83, 88 (1998) (emphases added).

This he cannot do.  The "private subscriber data" that he complains ICE-HSI illegally obtained is not *his* subscriber data but K.T.'s.  Thus, the only person with cause to complain about the seizure of this information, if there is a complaint to be heard, is K.T.  It was the IP address assigned to her account that led ICE-HSI to seek a search warrant for the residence that she shared with Barnes.  Barnes cannot vindicate constitutional rights that belong to another, and that alone is fatal to his suppression claim.

//

//

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 6

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

**2.  The Fourth Amendment does not shield subscriber information maintained by internet service providers because customers have no legitimate expectation of privacy in that information.**

Barnes's Fourth Amendment claim fails for a second, independent reason:  the Fourth Amendment does not protect information voluntarily provided to internet service providers by their customers.  Thus, even if Barnes had standing to assert a Fourth Amendment claim over K.T.'s subscriber information, there is no such claim to assert.

A criminal defendant "may invoke the protection of the Fourth Amendment only if he can show that he had a "legitimate expectation of privacy" in the place searched or the item seized.  *Smith v. Maryland,* 442 U.S. 735, 740 (1979).  No such expectation of privacy can exist where, as here, information has been voluntarily shared with a third party.  *Id.* at 740-45.  Barnes thus bears the burden of establishing a reasonable expectation of privacy in the subscriber information K.T. provided to Comcast, a burden he cannot meet.

It is well-settled that a "person has no legitimate expectation of privacy in information he voluntarily turns over to third parties."  *Id.* at 743-44.  This longstanding doctrine is fatal to Barnes's argument.  The only reason Comcast was able to provide his and K.T.'s address when ICE-HSI sought customer information associated with a particular IP address is because K.T. provided that information to Comcast voluntarily.  Neither she nor Barnes may complain their privacy has been violated when the government obtains information she freely shared.

And indeed, to the government's knowledge, "[e]very federal court to address this issue has held that subscriber information provided to an internet provider is not protected by the Fourth Amendment's privacy expectation."  *United States v. Perrine*, 518 F.3d 1196, 1204-05 (10th Cir. 2008); *see also United States v. Corbitt*, 588 F. App'x 594 (9th Cir. 2014); *United States v. Wheelock*, 772 F.3d 825, 828-29 (8th Cir. 2014); *United States v. Bynum*, 604 F.3d 161, 164 (4th Cir. 2010); *Guest v. Leis*, 255 F.3d 325, 336 (6th Cir. 2001).

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 7

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

Anticipating this argument, Barnes looks to last term's *Carpenter* decision and invites this Court to do what the Supreme Court expressly declined to do:  that is, eschew the third-party doctrine.[3]   The Court's decision not to extend the third-party doctrine to cell site location information was "a narrow one," grounded in the "unique" character of such information.  *United States v. Carpenter*, 138 S. Ct. 2206, 2217-2220 (2018).  Such records, the Court explained, "reveal[ ] not only [a person's] particular movements, but through them [the person's] 'familial, political, professional, religious, and sexual associations.'"  *Id.* at 2217 (internal citation omitted).  *Carpenter*, however made clear the decision in no way "disturb[s] the application of" the third-party doctrine, nor does it "address other business records that might incidentally reveal location information."  *Id.* at 2220; *see also United States v. Contreras*, 905 F.3d 853, 857 (5th Cir. 2018) (rejecting the defendant's argument post-*Carpenter* that a subscriber has a reasonable expectation of privacy in ISP records revealing "only that the IP address was associated with" the defendant's residence).

In short, if his lack of standing were not already fatal to his request for suppression, the third-party doctrine surely is its undoing.

**3.     In any event, suppression is unwarranted under the good faith doctrine.**

Assuming *arguendo* Barnes's Fourth Amendment rights were infringed, the good faith doctrine precludes suppression here.  The exclusionary rule does not apply "where [an] officer's conduct is objectively reasonable," because suppression "cannot be expected, and should not be applied, to deter objectively reasonable law enforcement activity."  *United States v. Leon*, 468 U.S. 897, 919 (1984).  For that reason, "evidence obtained from a search should be suppressed only if it can be said that the law

---

[3] Indeed, with skill that would make Rumpelstiltskin himself envious, Barnes spins ISP subscriber information into the equivalent of a window into someone's very soul.  It is not.  What the government obtained was not some detailed journal of Barnes's every move or a laundry list of his favorite websites.  What the government obtained was the service address for an IP address he used to exploit a child, an address that he did not even provide.  Despite his laudable effort at creativity and hyperbole, it is clear there is no real privacy interest at stake here.

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 8

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  enforcement officer had knowledge . . . that the search was unconstitutional under the

2  Fourth Amendment." *Id.* (internal quotation marks omitted).

3       At the time SA Berg relied on the summons to Comcast, courts uniformly held

4  (and thus far continue to hold) that basic subscriber information is not protected by the

5  Fourth Amendment.  As such, suppression would be improper since law enforcement

6  reasonably relied on the state of the law as it existed.

7       The statutory scheme governing stored and electronic communications applies the

8  same standard, only bolstering that good faith.  Under this scheme, the government may

9  obtain basic subscriber information, such as that requested from Comcast here, from an

10  ISP via grand jury, trial, or administrative subpoena, including summonses under Section

11  1509.  18 U.S.C. § 2703(c)(2); *see also United States v. Rubin*, 2 F.3d 974, 975 (9th Cir.

12  1993) (holding a Section 1509 summons is an "administrative subpoena").

13       In short, even taking Barnes's claim that subscriber information is protected under

14  the Fourth Amendment as true, the good faith doctrine would preclude suppression

15  where, as here, such information had no such protection at the time it was obtained.

16  **B.**    **Section 1509 authorized the summons to Comcast, and even if not,**

17  **suppression is unavailable for statutory violations of nonconstitutional magnitude.**

18       Section 1509 authorizes ICE-HSI's use of summonses to obtain records relevant to

19  child exploitation offenses, subject matter long recognized to be within the purview of

20  ICE-HSI.  The summons to Comcast plainly sought records relevant to a child

21  exploitation investigation, as it sought subscriber information for an IP address used by

22  an individual distributing and seeking out child pornography on a foreign photo-sharing

23  website.  Barnes's self-serving and crabbed interpretation of Section 1509 is wrong, and

24  even if correct, suppression would be unavailable to remedy a statutory violation that

25  does not implicate a defendant's constructional rights.

26       //

27       //

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 9

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

**1.    Section 1509 plainly authorizes the issuance of summonses to investigate child exploitation offenses.**

Section 1509 of Title 19 provides that the Secretary of the Treasury (now, the Secretary of Homeland Security) may issue three categories of summonses (sometimes referred to as "Customs Summonses") set forth in each of three subsections:  Subsection (a)(1) grants the authority to summon records; subsection (a)(2) grants the authority to summon persons to appear; and subsection (a)(3) grants the authority to take testimony under oath.  19 U.S.C. § 1509(a)(1)-(3).  Here, ICE requested records.  *See* Ex. 1. Section 1509(a)(1) thus controls and provides:

> In any investigation or inquiry conducted for the purpose of ascertaining the correctness of any entry, for determining the liability of any person for duty, fees and taxes due or duties, fees and taxes which may be due the United States, for determining liability for fines and penalties, or for *insuring compliance with the laws of the United States administered by the* United States Customs Service, the Secretary (but no delegate of the Secretary below the rank of district director or special agent in charge) may—
>
> (1) examine, or cause to be examined, upon reasonable notice, *any record* (which for purposes of this section, includes, but is not limited to, any statement, declaration, document, or electronically generated or machine readable data) described in the notice with reasonable specificity, which *may be relevant* to such investigation or inquiry.

19 U.S.C. § 1509(a)(1).  Section 1509 clearly empowers ICE to request "any record" that "may be relevant" to an investigation or inquiry for ensuring "compliance with the laws of the United States administered by [ICE]." *Id.*

The summons here easily meets this standard.  After all, "ICE has been traditionally responsible for investigating wrongdoing on a national and even global stage, and has had substantial duties in investigating and serving search warrants upon alleged purveyors of child pornography."  *United States v. Cray*, 673 F. Supp. 2d 1368, 1377 (S.D. Ga. 2009).  In particular, ICE-HSI is "tasked with investigating violations of 18 U.S.C. § 2251, with which [Barnes] is charged in this case."  *United States v. Merrell*, 88 F. Supp. 3d 1017, 1033 (D. Minn. 2015), aff'd 842 F.3d 577 (8th Cir. 2016). .

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 10

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1    Courts have therefore had no trouble concluding that Section 1509 authorizes ICE

2    (and thus HSI) to use summonses in connection with child exploitation investigations.

3    For example, *Cray* held, "Customs Summonses were used to further a legitimate

4    investigative purpose in compliance with the statute" when ICE agents conducting a child

5    pornography investigation obtained the physical address associated with an IP address.

6    673 F. Supp. 2d at 1377.  Likewise in *Merrell*, the court concluded ICE did "nothing

7    improper" when issuing a Section 1509 summons in connection with a child pornography

8    investigation.  88 F. Supp. 3d at 1033.  Indeed, 6 U.S.C. § 473(a)(1) provides that the

9    Secretary of Homeland Security "shall operate, within [ICE-HSI], a Cyber Crimes

10   Center" and that within the Cyber Crimes Center, there shall be a Child Exploitation

11   Investigations Unit that "shall coordinate all [ICE] child exploitation initiatives."  6

12   U.S.C. § 473(b)(1)-(2).  It should be no surprise, then, that ICE-HSI agents like SA Berg

13   "are experts in investigating child exploitation offenses."  *United States v. Fletcher*, 763

14   F.3d 711, 713 (7th Cir. 2014).

15   Surely Section 1509 sweeps within its scope the authority to issue summonses for

16   records relevant to investigations that are a core part of the agency's expertise and

17   mission.  ICE-HSI was working to ensure "compliance with the laws of the United States

18   [it] administer[s]."  19 U.S.C § 1509(a)(1).  The summons used here therefore furthered

19   "a legitimate investigative purpose in compliance with the statute." *Cray*, 673 F. Supp. 2d

20   at 1377.

21   Nothing Barnes offers in his motion supports a contrary view.  He first says that

22   the summons to Comcast is a problem because such summonses may only be used by the

23   U.S. Customs Service (which no longer exists) and then only as part of an inquiry into

24   import duties, tariffs, or other matters related to the importation of goods.  That first

25   concern is easily dismissed.  DHS, and thus ICE, has the authority to use Section 1509

26   summonses because the Homeland Security Act of 2002 transferred the functions of the

27

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 11

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  Customs Service to DHS.  6 U.S.C. § 203.[4]  Section 1512 of the Act provides,

2  "[r]eferences relating to an agency that is transferred to the Department in statutes . . .

3  shall be deemed to refer, as appropriate, to the Department [of Homeland Security]."  6

4  U.S.C. § 552(d); *see id*. § 557.  Section 1509 thus expressly authorizes DHS to use such

5  investigative summons.

6       Invoking the statutory cannon *noscitur a sociis*, Barnes claims that Section 1509's

7  reference to "laws of the United States administered by" DHS must be read to be limited

8  only to matters of tariffs, import duties, and the like.  That canon, however, typically

9  applies to a series of words in a list, such as "prospectus, notice, circular, advertisement,

10  [or] letter," *Gustafson v. Alloyd Co., Inc.*, 513 U.S. 561, 575 (1995) (internal quotation

11  marks omitted), not to the meaning of an entire clause.  Congress could easily have

12  included words of limitation but did not.  Barnes's attempt to graft onto the statute his

13  preferred language should be rejected.

14       Barnes also wrongly claims that his crabbed and self-serving interpretation of

15  Section 1509 finds support within DHS itself.  His entire focus, though, is the use of

16  Section 1509 summonses by CBP agents.  Nothing Barnes points to in his brief binds ICE

17  (and thus HSI), which is a separate agency within DHS with its own distinct mission.

18  And nothing about CBP's use of 1509 summonses concerns ICE's use of those same

19  summonses given the division of responsibilities.  After all, when DHS was created,

20  "[p]rimary investigative jurisdiction in the enforcement of immigration and customs laws

21  was transferred from Customs to [ICE]." *Callaway v. U.S. Dept. of Treasury*, 824 F.

22  Supp. 2d 153, 155 n.2 (D.D.C. 2011) (internal quotation marks omitted).

23       In any event, the use of the summons at issue here is consistent with Barnes's

24  preferred interpretation.  That is, he says 1509 summonses are limited to requests for

25  information related to violations of Title 8 or Title 19.  But investigations into the

26

27  [4] Under the Act, "the United States Customs Service was divided into the Bureau of Customs and Border Protection

28  and the Bureau of Immigration and Customs Enforcement, both of which are part of the Department of Homeland Security." *United States v. Reyeros*, 537 F.3d 270, 274 n.2 (3d Cir. 2008).

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 12

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  importation of child pornography are obviously "related" to provisions in Title 19

2  prohibiting the importation of obscene materials and other contraband.   Barnes also cites

3  CBP's statement that a Section 1509 summons should be used only where there is

4  probable cause to believe that the records relate to the importation of merchandise that is

5  prohibited.  Given that Barnes discussed and sought to exchange child pornography with

6  an undercover Australian officer via a foreign photo-sharing website, there was surely

7  probable cause to believe he was attempting to import child pornography.

8       Second, relying on the incorrect statutory provision, Barnes complains that even if

9  ICE-HSI has the power to issue the summons at issue here, the records that can be sought

10  are limited to those defined in Section 1509(d)(1)(A).  That definition, he explains,

11  precludes ICE from compelling the production of customer records from an ISP.  Here

12  too he misses the mark.

13       The summons used here was a request for records, not a demand that someone

14  appear in person.  *See* Ex. 1.  This is important because the statutory provisions

15  governing these two types of summonses proscribe different limitations on what types of

16  records may be sought.   *Compare* 19 U.S.C. § 1509(a)(1) *with id.* § 1509(a)(2).

17  Subsection (a)(1), unlike Subsection (a)(2), permits any records to be summonsed that

18  "may be relevant" to the investigation or inquiry underway. 19 U.S.C. § 1509(a)(1).  The

19  Comcast records at issue here were obviously relevant to the investigation as they could

20  assist in identifying the individual who was actively seeking to exchange child

21  pornography with an Australian law enforcement officer.

22       And even if Section 1509(a)(2)—and its cross-reference to subsection (d)(1)(A)—

23  applies, the summons at issue would satisfy its requirements.  Subsection (d)(1)(A)(ii)

24  defines "records" to include those "regarding which there is probable cause to believe

25  that they pertain to merchandise the importation of which into the United States is

26  prohibited."  The communications between Barnes and the Australian officer provided

27  ample probable cause to believe that records from Comcast pertained to just such

28  merchandise—namely, child pornography.  *See United States v. Hale*, 784 F.2d 1465,

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 13

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1466-1467 (9th Cir. 1986) (Child pornography is "merchandise imported contrary to law in violation of 19 U.S.C. § 1305 and 18 U.S.C. § 545."). Thus, even under Barnes's incorrect interpretation, the summons used by ICE-HSI fell within the scope of Section 1509.

**2.     Even if the summons were unlawful, suppression is unavailable to remedy statutory violations that do not implicate constitutional rights.**

Even assuming Barnes were correct that the summons to Comcast was unlawful, he is not entitled to suppression. "[T]here is no exclusionary rule generally applicable to statutory violations." *United States v. Clenney*, 631 F.3d 658, 667 (4th Cir. 2011) (internal quotation marks omitted). The Supreme Court created the exclusionary rule as a "sanction that bars the prosecution from introducing evidence obtained by way of a Fourth Amendment violation." *Davis v. United States*, 564 U.S. 229, 231-32 (2011). Its "sole purpose" is to "deter future Fourth Amendment violations." *Id*. at 236-37. As such, the exclusionary rule has rarely been extended beyond the context of constitutional violations. Indeed, the Supreme Court has approved the exclusion of evidence for statutory violations only in cases where "the excluded evidence arose directly out of statutory violations that implicated important Fourth and Fifth Amendment interests." *Sanchez-Llamas v. Oregon*, 548 U.S. 331, 348 (2006); *see also United States v. Abdi*, 463 F.3d 547, 556 (6th Cir. 2006).

Barnes is thus not entitled to suppression because even if obtained unlawfully under Section 1509, the information is not, as detailed above, protected by the Fourth Amendment. Section 1509 provides no suppression remedy itself, and Barnes's constitutional rights are in no way implicated by the Comcast summons. As such, there is no valid basis for suppression even assuming the summons whether or not the summons violated Section 1509. *See United States v. Smith*, 155 F.3d 1051, 1056 (9th Cir. 1998).

Equally important, suppression is a "last resort" not a "first impulse." *Herring v. United States*, 555 U.S. 135, 140 (2009). Any benefit to doing so (general deterrence of

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 14

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  law enforcement misconduct) must outweigh the substantial social cost that results when

2  "guilty and possibly dangerous defendants go free."  *Id.* at 140-41.  Suppression's

3  "bottom-line effect, in many cases, is to suppress the truth and set the criminal loose in

4  the community without punishment.  Our cases hold that society must swallow this bitter

5  pill when necessary, but only as a last resort.   For exclusion to be appropriate, the

6  deterrence benefits of suppression must outweigh its heavy costs."  *Davis*, 564 U.S. at

7  237 (internal citations and quotation marks omitted).

8       Here, Barnes cannot clear the "high obstacle" he must to justify application of the

9  exclusionary rule.  *Herring*, 555 U.S. at 141.  The gravamen of Barnes's argument is that

10  suppression is critical to deter the government's so-called widespread abuse of Section

11  1509 summonses.  If his gripe is that no agency or judicial officer has yet embraced his

12  novel and unsupported statutory argument, his frustration is understandable.  But that is

13  hardly evidence of widespread abuse.  He cites no court decision suggesting that 1509

14  summonses are improper tools to further child exploitation investigations.  And while he

15  points to various statements concerning CBP's use of these summonses, these have no

16  bearing on the legitimacy of their use by ICE.

17       But even assuming this Court believes that 1509 summonses should not be used in

18  the manner used in this case, the balancing required by the Supreme Court clearly

19  disfavors suppression.  The costs are obvious and substantial:  a dangerous, hands-on sex

20  offender may escape responsibility for his horrific crimes.  The deterrent value is equally

21  clear, but it is also negligible.  The information at issue is not constitutionally protected.

22  The deterrent effect will thus bear only on the manner in which the information is sought,

23  not whether it is collected.  After all, the same information is available through a grand

24  jury subpoena or administrative subpoena issued under the authority of the Attorney

25  General, 18 U.S.C. § 3486(a)(1).  If widespread misuse of 1509 summonses is indeed

26  cause for concern, then the entities best equipped to remedy that are the recipients of

27  those summons, not criminal defendants.  The price of suppression is always a high one.

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 15

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1    Society should not be forced to bear that cost, the Supreme Court has explained, unless

2    necessary to vindicate important constitutional rights.

3    **C.      Suppression is unwarranted for a warrant executed just after 5:00 a.m. with**

4    **the express authorization of a Magistrate Judge.**

5           Barnes's second basis for suppression fares no better.  He grouses that the search

6    of his home and person was unreasonable because it occurred at nighttime—that is, just

7    after 5:00 a.m.  As a threshold matter, the daytime requirement for search warrants does

8    not come from the Fourth Amendment itself, which requires only reasonableness.

9    Instead, Rule 41 requires warrants be executed between 6:00 a.m. and 10:00 p.m. unless

10   the magistrate judge expressly authorizes execution at a different time based on a

11   showing of good cause.  Fed. R. Crim. Proc. 41(e)(2)(A)(2)(ii).

12          Here, SA Berg specifically requested authority to execute the warrants before 6:00

13   a.m.  In fact, he told Magistrate Judge Fricke that he planned to execute the warrants not

14   at just any time of night, but between 4:00 and 6:00 a.m.  In the affidavit, SA Berg

15   explained that observations of Barnes's morning schedule showed that he left his home

16   for work at or before 6:00 a.m.  And given his experience, SA Berg told Magistrate Judge

17   Fricke that it would be preferable to execute these warrants with all occupants of the

18   home present.  Given these representations and finding good cause, Magistrate Judge

19   Fricke authorized execution before 6:00 a.m. as required by Rule 41.  *See* Ex. 2.

20          SA Berg's request made sense.  In a matter of days, ICE-HSI had identified

21   someone actively abusing a young girl.  SA Berg acted quickly to gather the necessary

22   resources to conduct a safe and effective search operation.  Though Barnes seems to

23   sneer at SA Berg's "preference," he is trivializing something that is far from trivial.

24   There are obvious investigative and safety advantages to having a single search team and

25   a single search location.  Agents could have waited and conducted multiple searches in

26   multiple locations to be sure.  But doing so might have risked Barnes's learning of the

27   investigation with time to destroy evidence.  And it would have strained already limited

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 16

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  resources in a case where time was of the essence and delay simply to have more

2  personnel would have only risked further harm to a vulnerable victim.

3      This should be the end of the matter of course.  But Barnes insists otherwise,

4  demanding suppression because law enforcement executed search warrants at 5:16

5  instead of 6:01 a.m.  Other than saying SA Berg failed to state "good cause," however,

6  Barnes offers nothing to support his position.  His opinion on the matter should surely be

7  taken with a grain of salt, as he has a considerable amount to gain if his view were to

8  carry the day.  Defense counsel notes that he is unaware of the execution of a nighttime

9  search in such a routine case in all his years of practice in this District.  Government

10  counsel is in a similar boat, as such requests are in his experience the exception, not the

11  rule.

12      Rarity is not evidence of impropriety, however.  Indeed, it is far likelier to suggest

13  discretion and the exercise of judgment.  In any event, the people in the best position to

14  determine how most effectively and safely to execute a search warrant are those in the

15  business executing them.  One such person, SA Berg, obviously thought nighttime

16  execution would be appropriate here in light of those considerations, and nothing Barnes

17  offers calls that judgment into question.

18      Noting the paucity of authority on what constitutes good cause in this context,

19  Barnes simply strings together a handful of cases that collectively stand for the

20  unremarkable proposition that nighttime searches are particularly sensitive and must be

21  justified.  The one Ninth Circuit case he relies upon hardly sheds light on what good

22  cause means or how it should be assessed.  Rather, the court in that case expressed the

23  view that a search supported by an affidavit containing material falsehoods should not

24  have taken place at all, much less during "nighttime" hours.  If that is Barnes's point,

25  then point taken.

26      But the government remains at a loss as to what exactly law enforcement was

27  supposed to have done differently in this case.  SA Berg explained how he hoped to

28  execute the warrants, why earlier execution was necessary for doing so, and obtained the

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 17

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1  express judicial authorization Rule 41 requires.  If, with the benefit of hindsight, the

2  Court believes that Magistrate Judge Fricke should have required more of SA Berg

3  before authorizing an earlier execution, then so be it.  But application of a suppression

4  remedy in such a situation would do nothing to further the aims of the exclusionary rule.

5  Suppression is meant to deter misconduct, not good faith attempts to comply with

6  applicable rules.  *Leon* thus surely precludes suppression here.

7  **D.    Suppression is unwarranted because the search did not violate Barnes's**
8  **Fourth Amendment rights and any alleged violation of Rule 41 was neither deliberate nor caused prejudice to Barnes.**

9     Even assuming Barnes is correct that good cause was lacking, he offers no real

10  explanation as to how execution less than an hour before the 6:00 a.m. cutoff was

11  unreasonable under the circumstances.  Nor can he.  Implicit in his criticism seems to be

12  the notion that SA Berg and the rest of the agents were cavalier in their approach.  In

13  reality, they were anything but.  They did not, for example, burst through the door

14  unannounced in the middle of the night.  While there may be circumstances where such

15  tactics are appropriate, that was not the case here.  Instead, agents set up surveillance and

16  waited until someone was awake in the home.  They then knocked and announced their

17  presence, waited for Barnes to answer the door, and then proceeded with the execution of

18  the search.  There is simply no credible claim that law enforcement acted unreasonably or

19  improperly.

20     And as the Ninth Circuit has explained, "we have repeatedly held—and have been

21  instructed by the Supreme Court—that suppression is rarely the proper remedy for a Rule

22  41 violation."  *United States v. Williamson*, 439 F.3d 1125, 1132 (9th Cir. 2006).

23  "Because the exclusionary rule tends to exclude evidence of high reliability, the

24  suppression sanction should only be applied when necessary and not in any automatic

25  manner."  *United States v. Luk*, 859 F.2d 667, 671 (9th Cir. 1988) (affirming denial of

26  suppression motion despite a technical violation of Rule 41).  Whether exclusion is

27  warranted "must be evaluated realistically and pragmatically on a case-by-case basis."

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 18

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

*Id.* (*quoting United States v. Vasser*, 648 F.2d 507, 510 n.2 (9th Cir. 1981), *cert. denied*, 450 U.S. 928 (1981)).

Courts need not suppress evidence obtained in violation of Rule 41 unless the violation is of constitutional magnitude or involved either (1) prejudice in the sense that the search would not have occurred or would not have been so abrasive if law enforcement had followed the rule, or (2) bad faith such as intentional disregard of a provision in the Rule. *See United States v. Martinez-Garcia*, 397 F.3d 1205, 1213 (9th Cir. 2005). Here, any alleged Rule 41 violation was clearly not of constitutional magnitude and was neither deliberate nor a violation that caused prejudice to Barnes. Suppression is thus unavailable.

The Fourth Amendment demands three things of a search warrant: it must be issued by a neutral magistrate judge; it must be based on a showing of "probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense"; and it must satisfy the particularity requirement. *Dalia v. United States*, 441 U.S. 238, 255 (1978) (internal quotation marks omitted). Barnes does not claim any such defects, only that a search that occurred less than one hour before it would have normally been allowed under Rule 41 in the usual course was unreasonable under the Fourth Amendment. That surely will not suffice to establish a constitutional violation, when every indication is that the law enforcement complied scrupulously with constitutional requirements governing search and seizure.

Any potential Rule 41 violation was also not deliberate or the result of bad faith. How could it be? SA Berg sought the express authorization for an earlier search required by Rule 41, and Magistrate Judge Fricke granted it. Any noncompliance with Rule 41 was clearly the result of deliberate disregard for the rule. Barnes also suffered no prejudice. The searches would have occurred irrespective of any Rule 41 violation, albeit a little later in the day.

By obtaining express permission from the magistrate judge to execute the warrants at night, the government honored the Fourth Amendment's overriding safeguard:

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 19

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

interposing the judgment of a "neutral and detached magistrate" between themselves and the defendant's residence.  *Johnson v. United States*, 333 U.S. 10, 14 (1948).  The value of the exclusionary rule is its ability to deter law enforcement misconduct and safeguard a defendant's constitutional rights.  That goal would hardly be furthered by suppression here, and Barnes's motion should be denied.

## IV.    CONCLUSION

For all the foregoing reasons, the Court should deny Barnes's motion to suppress evidence in its entirety without any hearing.

DATED this 6th day of May, 2019.


Respectfully submitted,

BRIAN T. MORAN
United States Attorney

*/s/ Matthew P. Hampton*
MATTHEW P. HAMPTON
Assistant United States Attorney
700 Stewart Street, Suite 5220
Seattle, Washington 98101
Telephone:    (206) 553-7970
Fax:               (206) 443-0755
E-mail: matthew.hampton@usdoj.gov

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 20

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970

1

CERTIFICATE OF SERVICE

2        I hereby certify that on May 6, 2019, I electronically filed the foregoing with the

3   Clerk of the Court using the CM/ECF system, which will send notification of such filing

4   to the attorney(s) of record for the defendant.

5

6                                          *s/Jenny Fingles*_____

7                                          JENNY FINGLES
                                           Legal Assistant
8                                          United States Attorney's Office
                                           700 Stewart Street, Suite 5220
9                                          Seattle, Washington 98101-1271
                                           Phone: (206) 553-2270
10                                         FAX:   (206) 553-0755
                                           E-mail: jenny.fingles@usdoj.gov
11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

GOVERNMENT'S RESPONSE TO DEFENDANT'S
MOTION TO SUPPRESS (Dkt 32)
CR18-5141BHS/BARNES - 21

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON  98101
(206) 553-7970